The next case is Regents of the University of Minnesota v. David Kappos and Adria Medical Corporation, 2010-13-21. Is it Corneli? It is, Your Honor. All right. Mr. Corneli. May it please the Court, good afternoon. The University's petitions for delayed payment of a maintenance fee should not have been rejected by the USPTO. Those petitions demonstrated that the University acted reasonably, that its long-standing TIMS docketing system was a reliable docketing system, and that its long-serving personnel, who were experienced with that TIMS docketing system, were properly entrusted to maintain 900-plus patents, including the 291 patent that expired in this case. This was a patent of some interest to the University, and I gather it had been litigated, and more than three and a half years had passed without recognizing that the fee had been due, and therefore the patent lapsed. And the test is unavoidable. That's a hard test. Well, you properly construed the unavoidable standard is, of course, the standard of reasonably prudent persons, not acts of war or God or something like that. Not inadvertent. Not inadvertent. Unavoidable. Unavoidable, meaning were you reasonably prudent in conducting your business with respect to these patents, and in this case the University was just that. They implemented a reliable docketing system, and they added the 291 patent to that docketing system. So they had the right to rely upon the reasonable or an ordinary course of business as it went along. The court's exactly right. The 291 patent was of interest because it was being reissued. At least an application had been filed for reissue as early as 2002. And then your person instructed someone abandoned, right? Abandoned the patent. Not exactly, Your Honor. The record's quite clear that in 2001, before the 291 was even part of the University's docketing system, in a separate context, Laurel Korgard, the docketing clerk who made the unfortunate error here, had a separate discussion with her supervisor when she was trying to make sure that the University was accurately counting its issued patents for purposes of reporting out to this University organization, AUTM. In that context, she wrote down some notes from January 2001, and those notes were carried forward. The very first time after that conversation that Ms. Korgard had the opportunity, or the occasion I should say, to address the fact of a reissued application was with the 291. So a first-time error on an isolated incident led to the unfortunate docketing entry. Pursuant to instructions of an attorney. Wasn't the first finding by the PTO a statement to the effect that the attorney who was named Mr. Strauss? Mr. Strauss. An experienced attorney instructed the clerk to mark the 291 abandoned because of the reissue? That was a finding by the PTO, wasn't it? Yes, and it's erroneous for the very reason that they are conflating two different things. Mr. Strauss and Ms. Korgard were never discussing the 291 in January 2001. They were discussing a procedure for coming up with an accurate count of then-issued University patents. The 291, 18 months later when Ms. Korgard had the occasion to make the data entry that led to the missed payment, looked back at those notes, that's in her declaration, and she looked back at those notes in error. Mr. Strauss wasn't standing over her shoulder when she made the data entry on the 291. It had nothing to do other than that was the record she went back and looked at to make her entry. One of the questions that bothered me about the whole process, was there any evidence in the record to show the instructions or the specific training that was given to the two individuals? Where is that in the record? I have a litany, Your Honor. Point to the specific portion of the record that shows that the two individuals were trained and instructed as to the process of filing the fees and the reissue fees that could be maintained while the patent is still valid. The court's asking about specific instructions about filing for a reissue. Training. What training were the two individuals given and provided for the specific purpose? Well, I'm focusing now on Ms. Korgard because she's the person who made the docketing entry. Mr. Strauss, her supervisor, had no occasion to or responsibility for docketing. And here's what was said about... But he was a trained attorney, wasn't he? He was an admitted... he was an attorney, yes, that's right. He was not an attorney? No, he was not, Your Honor. He was not a patent attorney. Not registered before the patent office and he didn't prosecute patents. He worked in the university's offices as an administrator. So, again, if the USPTO drew that assumption, we cleared that up. They did not draw that assumption. But what specific training was provided to the two individuals by the university in the process of maintaining the records and paying the fees? I could point the court to 1181 and 1182 where Ms. Garrison, Ms. Korgard's direct supervisor, said, in the beginning of our association, I frequently double-checked Ms. Korgard's reports for accuracy, found her reports to be reliable. As time went on, due to my periodic review of her work, which revealed it to be of characteristically accurate nature, I gradually reduced my review of her work product and relied on her to make entries into the TIMSS database. That does not speak to the issue of training that the individuals received in the process of paying the fees and the structure required by the patent office to pay the fees. Well, I don't want to be drawn into what training, because the USPTO is basically holding us, has held us in this proceeding to this trap of, you have to show us something about what training is, but we aren't going to tell you or, quite frankly, any other patent holder what training would be adequate. Well, what would a reasonable university require its employees to be trained without performing this function? They would be supervised at the beginning of their tenure, and Ms. Korgard was there from the very beginning. I just quoted to the court a section of her supervisor's... Well, day by day, event by event, you are trained in your job, whether you go to... Sometimes we go to CLEs... You're saying you don't really need any training to know that on a stated date you have to pay a fee? No, Your Honor, I'm not saying that at all. But we don't know what training would satisfy the USPTO. We've put forth in the declarations and the petitions that day by day, over the course of time, this woman was trained to do her job. How do we know that? They had never had this error before. Are you supposed to train everyone or someone to do something that may or may not be anticipated? It's impossible for the PTO to explain to us. I'm surprised you answered my question the way you did. My question was, does one really need training to know that on a specific date or before you have to pay a fee? They don't need training for that. But the system is set up precisely so that Ms. Korgard could make the data entries, and she did, reliably, time after time. Now, the first time she encountered this particular type of data entry, she made an error. But the... But her notes, she said, her notes led her to do it, but that's what she understood the lawyer could have told her to do in the circumstance. That's what she understood, that's right. He said, well, he would never do that. He would know that was not right. But, of course, you just said he's got a patent lawyer, so I don't know. But isn't it the finding of the board that matters rather than the piece that she said on this? Well, what we're here to have this court correct is the PTOs and the Office of Petitions' really arbitrary application of this standard in our case compared both to the other petitioners that we've cited in our briefs, such as the California medical case or the Upjohn case, but also the fact that they are using this circular logic to say, point out the error that led to the mispayment, point out the system, and as soon as you point out the error, we're going to show you how it is that this person wasn't trained well enough. How do we know? They committed this error. That's circular. They could use that logic to deny any petition in an arbitrary manner, and that's what they've done to us here. I could certainly point out all the facts in the record about her training, but those are in the brief. One thing I do want to point out. You don't tell his guidance to her that she may or may not have misunderstood his training? Well, it is training, but it's day-to-day training, on-the-job training, absolutely. It's the most specific to this incident, isn't it? It's not specific to this docketing of the 291. No, not to the incident. You gave the guidance that she may or may not have understood properly, and the first time it came up was with this. Did she apply what she thought she'd been told? And she made a reflexive error in entering the data, and it led to the missed payment. That is the only error, but the PTO is holding us to a no errors kind of standard because once you show the error, they're basically saying, well, obviously this person wasn't trained well enough. The PTO is holding you to an unavoidable standard rather than an inadvertent standard. Isn't that right? Well, that the unavoidable standard, that's right, that's right. Unavoidable. Unavoidable. It could have been avoided in lots of ways, periodic checking, on many occasions. Happenstance, perhaps. And so when we compare the way that our petitions were treated by the USPTO and this rhetorical question that was then repeated by the district court in denying our summary judgment motion, that if she was sufficiently trained, how could she have ever made this entry, they're ignoring the entire record. They're ignoring all the facts and circumstances that we put before them. What does the statute require? Does the statute use the term unavoidable? It does. It uses the term that we have to deal with legally, right? It is. And, of course, this court and courts around the country, indeed the PTO has cited to those cases that talk about unavoidable doesn't mean literally unavoidable, as Judge Lurie said. It means in the exercise of reasonable care with attention to your business, yet a docketing error occurred. In fact, the MPEP, which guides the PTO, sets out that a docketing error in an otherwise reliable system can indeed be a basis for finding unavoidability. I see that I'm into my rebuttal time. We'll stand it for you. Mr. Johnson, in your splitting of time, will you please go again? That's correct, Your Honor. May it please the court, this court is completely correct with respect to the standard that's applied when there's an argument for unavoidable delay. The statute was enacted to be strict, and the legislator has indicated that a patentee who raises this argument has a heavy burden in order to establish a delay was unavoidable. Here, the university dragged their feet, and they did not argue an unintentional standard, which is looser than the unavoidable. It would appear to be that way, considering all the efforts that they put into it. Why does the office premise have this training requirement? What kind of training do you need? You have a system. One knows that patents have to have maintenance fees or issue fees or whatever, and we know what a calendar looks like. There's some sort of system, and it's almost normal intelligence being familiar with this system. What kind of training does one need? First of all, the requirement is tied into the burden because a reasonable person who has a multimillion-dollar organization would make sure that its docketing clerk was sufficiently trained with whatever systems that docketing clerk was dealing with. So what sort of training could have been shown here? Well, there's an excellent example in the record, the North American container case, where in that case the docketing clerk received a number of hours of training. They were taught with respect to their specific duties how it's tied into the patent laws, and they received instructions from the two supervising attorneys to make sure that the docketing clerk was actually doing their duties correctly. That's the sort of training that could have been done here, and there's just a wide variety of types of training, but that's just one example that the PTO has established through one of its decisions. But none of that took place here. They argued before the PTO that their petition should be granted because their docketing clerk received training from time to time. Well, the PTO asked, what training was it? Just describe it. They did not present the agency with any evidence that Ms. Colgaard received any training prior to her error here. What we have, Your Honor, is a situation where they had an R-based data system at one point, and that was created by one of their employees, and that individual instructed Ms. Colgaard on how to use the system prior to her getting involved with it, and then at some point they switched over to the TIM system, and instead of giving her sufficient training to ensure that she knew what she was doing as it relates to reissue applications, they just said use the system and they checked with her from time to time to see how she was doing, and they said that if you have any questions, speak to your supervisor or the individual who created the system. But they did not give her the necessary training beforehand. My understanding is that she or he or someone involved labeled this patent abandoned because it was going through reissue. That was an error. That almost has nothing to do with training. That's a misunderstanding. Of course, when you have a patent reissued, you surrender it. That's correct, Your Honor. That's after the reissue is, I guess, allowed. Right. That's a basic misunderstanding, isn't it? I don't know that it's a basic misunderstanding, Your Honor, but someone who is responsible for reissue docketing should know what that word abandoned would mean, what sort of effect that would have on the reissue application, and she wasn't trained to know that, and a reasonable person that has a large organization would ensure that their employee knew that because the effects would be detrimental. What if she was relying on the attorney's advice and the advice that you contained was wrong? If she was following the business routine for that office and the routine was to follow the attorney's instruction, then that would be a different case from what we have here, but, again, it would come down to her training. If she's sufficiently trained, then that would be a different consideration. Or the attorney's training? Or the attorney's training as well. That could be part of the consideration, Your Honor. Let me ask you a question. Why shouldn't the unavoidable delay start at a time that a person could reasonably be able to find out that the map has been abandoned? Why doesn't the time period start from that point rather than when the filing fee was due or the maintenance fee was due? I see. Well, it all begins with the statute, Your Honor. The statute said 41B states that a maintenance fee must be paid within six months of its due date. Otherwise, it would be expired. 41C says that, well, the director can accept a late payment if the delay is shown to be unavoidable. And the definition for delay within the context of those two sections shows that the unavoidable explanation has to be from the period in which the patent expired to the point in which the payment is ultimately made. But shouldn't you take the six-month grace period into account plus the other time period? Sure, it is taken into account, Your Honor. That six-month grace period really includes the time in which the patent expired. At the point in which it's expired to the point in which payment is ultimately made, that's the entire period that the statute was talking about with respect to a showing of delay. And that's what our regulation is getting at. It's being consistent. But I would think it would be outside of the six-month grace period. If you have an automatic six-month grace period, if you pay your fee within that six months, then the patent is established, correct? That's correct, Your Honor. Outside of that six months, let's assume for the moment that a patent fee was due on February 1st. It would be six months later, August 1st. So during that time period, you have a grace period and you pay your fee at any time without showing any requirement of delay or unavoidable delay. That's correct, Your Honor. Only after that time period. That's right. You know that grace period, you pay an additional surcharge, but yes, your patent would still be in effect. It's after the grace period that's the trigger point. If I don't find out that the fee has not been paid until November 1st, do I have to show that the unavoidable delay would start from February 1st, August 1st, or November 1st when I first find out? Not at the point at which you first find out. It's at the point of expiration. But if you find out just a few months later in November, you fall under the unintentional state. And that standard is very loose. And you could have your patent reinstated within two years of that particular expiration date. That's not what happened here. So you have six months of grace period plus two years. That's correct, Your Honor. That's three months altogether. It's quite some time. Because this was outside of a 30-month period, then you rolled into a different standard? That's correct, based upon the statute. That's what Congress's intent was. We will allow you, patentee, to come back and get your patent reinstated in the easiest way possible if you just simply show that it was unintentional. But outside this 30-month period- Unintentional or unavoidable? Unintentional. Within six months? Within the six-month grace period. With the six-month grace period. But after that period of time, then you have a very heavy burden because the patent community is also concerned with what has been issued. So we're going to have you be held to a very strict standard. Was the collapse of the patent published in the Official Gazette? Yes, Your Honor. It was. And on the inside cover of each- In other words, the collapse could have been avoided simply by routinely perusing the Gazette. That's correct, by monitoring the different lapse patents that are there in the Official Gazette. Of course, there probably are dozens, hundreds in each edition. I don't know the exact number for any particular date in which the OG is published, Your Honor. But what would a reasonable person do that has such a significant company? They would take whatever steps are necessary to ensure that their patent remained in force, and that is one step. The inside cover of the patents remind patentees that they have to make a payment within a certain date. So there were a number of different types of notice that was given to the patentee here, but they just didn't fulfill their obligations by acting like a reasonably proven patentee under the circumstances. Was there any notice published or sent out by the Patent Office to the patent holder saying that a fee is due within 30 days of this date? No, Your Honor. That is not a practice which the PTO follows at this time. There is sufficient notice, as I just mentioned, on the inside of the patent itself, which gives the patentees the notice that they need to submit their payment within a certain period of time. Thank you, Mr. Johnson. Ms. Norgay has five minutes. Good afternoon. May it please the Court? I'd like to address three brief points in opposition to this appeal. First of all, the standard of deference that applies to this case simply cannot be overstated. The statute itself at issue here, 41C in black and white, says, it's only unavoidable if it's to the satisfaction of the director. That's in the statute. Second of all, we're here under the APA, which, as this Court well knows, is a very deferential manner to review a case, and the arbitrary and capricious prong is the most deferential under the APA. And third, we have deference under Chevron, which gives deference to an agency's interpretation of a statute, to an agency's interpretation of a regulation, and to an agency's application of a statute and regulation, especially in a case like here, where those statutes and regulations have been consistently outwardly applied through time, and that has been the case here. Is this a procedural regulation or a substantive regulation? It's a substantive regulation, meaning unavoidable is a substantive question. Was it substantively unavoidable? I didn't realize that the Patent Office had authority to issue substantive regulations. Maybe I misunderstood your question. It's a substantive question in the sense of the director's satisfaction is what's written into the statute. 41C says the director has to satisfy himself that the delay was unavoidable. But your answer is that it's a procedural regulation, not a substantive regulation. Then I misunderstood your question. The director can issue regulations affecting the substance of it. I'm sorry. Substantive law. I misunderstood your question. This relates to when and how you can pay the fee and what you do if you didn't pay the fee. Absolutely. That sounds like procedural. Absolutely, yes, yes. I misunderstood the context of your question. I'm sorry. I'd also like to address this entire period of delay issue. What the university wants the court to do is insert the word some into the statute. The statute says the director may accept payments of the maintenance fee if the delay is shown to the satisfaction of the director. They want to say if some of the delay is shown to the satisfaction of the director to have been unavoidable. Neither the PTO nor any court can write the word some into 41C. And, in fact, writing the word some into 41C contradicts the plain language of the statute. I'd also like to address the issue of training, which the court has queried the attorneys about. And in order to understand what kind of training would satisfy the director, the director actually says, we want to know the substance of the training. And, in fact, the university had a second try to set forth the substance of the training, not only for Ms. Korgard, who was the employee at the university, but also for her parallel counterpart at CPI, which is a very real part of the university's system. And the university points to two cases which I think are very instructive, Upjohn and North American Container. And in those cases, we see instances of working with trained patent attorneys. Here, Mr. Strauss was not only not a patent attorney, he wasn't even a practicing attorney. He was an administrator. He expressly said that he had no specialized knowledge of patents whatsoever. The other things you'll see in these cases are, I spent X hours. What kind of training is necessary? Can't you train someone in an hour to look at a list and a printout of dates and match it up with the fees that are due? How much training does one need to do this? This was a mistake, an inadvertence. Maybe not unavoidable, but it was an inadvertence. But I just don't understand what kind of serious training the patent office is trying to pull these people to. This data entry is not rote data entry that Ms. Corgard was performing. It was not in a vacuum. It takes place in the context of what necessarily is the university's most important business. There's nothing in the... Does the regulation talk about training? The regulation, yeah, the MPEP specifically sets forth the training. Yes, it does. But the CFR. I don't see it here. No, the CFR talks about a continuum of events. It talks about the delay has to be unavoidable. And then the CFR talks about the steps taken to ensure that maintenance fee was timely paid. That speaks to the system that was in place. The date and the manner the patentee found out about the delay, that could speak to the system or however it found out about the delay. And then the steps taken to file the petition promptly. But the MPEP, which the patent office uses as the manual for everybody to comply with this regulation, does talk about training. And, moreover, checks on the system. Checks to make sure that the training is, in fact, being followed through with appropriately. Thank you, Ms. Milgaard. I think we have your position. We only have a little more time. Thank you, Your Honor. I'll first address some of the comments made by the intervener, AGA. Nowhere in our briefs, nowhere in the position below, did we ever try to rewrite Section 41C. We never said some should be part of a statute. In fact, that argument ignores what Section CFR 1.378B actually says. And if you look at how its counterpart, 1.137, regarding abandoned patent applications, was amended, 1.378 was never amended to talk about entire periods of delay. So the patent office itself is the one that's doing the rewriting here. They're rewriting 1.378B in a manner to say, even though we're asking you to make a showing of the manner and date in which you became aware of or were otherwise notified of the missed payment, we are going to hold you to some constructive notice because, as the colloquy showed earlier, the Official Gazette does publish these expired patents within four or six weeks sometimes. And so what they're saying is, forget docketing systems. Forget reasonableness. It doesn't matter what you did. You were on notice six months after the grace period ended, or six weeks maybe, and you should have done a different thing. You should have gone back and poured over those registers because you don't have a right to rely on your docketing system. Now, how do we know that that's arbitrary? If you look at the other cases, North American Can, the Upjohn case, and the district court decision in Cal Medical, every one of those petitioners to the USPTO should have had their petitions denied on untimeliness. Those were all years after that publication of the Official Gazette. I'm sorry, Your Honor, I didn't catch the first part of your question. In fact, it should matter to the director. The director should look at that as one of the factual circumstances. That's right. My point, though, is that there was a lawyer telling her what to do. She wrote it down, and she did it. And maybe he wasn't qualified to be governor on this. Well, if we were talking about the North American case, the Gibson-Dunn clerk who had two years of experience and whose supervisor lawyer said, we gave this person the CFR, we gave him the federal statutes, and this person asked questions from time to time. We think we remember telling him about reissues. His declaration is, I don't remember anything about it, but maybe they did. And the first time I entered one of these reissues, in my experience, I messed up because of a lapsing judgment, I think was the quote from his declaration. It's the exact same thing here. They're holding us to a first-time error, unforgivable sin standard, and that's not right. I want to also go back to something that counsel for AGA was mentioning. The deference here is not deference to some sort of agency expertise. It's whether or not they misapplied the law and took a contrary view of the facts, which is against reason or common sense.  Do you have any other questions? One further thought? Well, other than that the relief we request, of course, is reversal of the district court's summary judgment and entry of summary judgment on counts 1 and 2 of the university's complaint. Thank you, Mr. Connelly. Case for detention and under advisement.